IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA,

     v.

RANDALE CHAPMAN,

       Defendant.

Criminal No. 21-073
Criminal No. 21-133

ELECTRONICALLY FILED

**MEMORANDUM OPINION AND ORDER DENYING DEFENDANT RANDALE
CHAPMAN'S MOTION TO SUPPRESS EVIDENCE (Doc. 85 at Crim. No. 21-73,
Doc. 77 at Crim. No. 21-133)**

Pending is Defendant Randale Chapman's Motion to Suppress Evidence.  (Doc. 85
at Crim. No. 21-73, Doc. 77 at Crim. No. 21-133).

## I.    BACKGROUND

Defendant was charged at Crim. No. 21-73 in a 3-count Indictment with: (1) possession
with intent to distribute quantities of fentanyl, methamphetamine and
methylenedioxyamphetamine in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(c);
(2) possession of a firearm in furtherance of a drug trafficking crime in violation of 18 U.S.C.
§ 924 (c)(1)(a)(i); and (3) possession of a firearm by a convicted felon in violation of 18 U.S.C.
§§ 922 (g) (1).  (Doc. 1 at Crim. No. 21-73).  These charges are based on Defendant's alleged
conduct on April 30, 2020.  (*Id*.)

Defendant was later charged at Crim. No. 21-133 in a 1-count Indictment with possession
with intent to distribute methamphetamine and oxycodone, in violation of 21 U.S.C. §§ 841(a)(1)
and 841(b)(1)(c)(1), based on Defendant's alleged conduct on February 5, 2021. (Doc. 1 at Crim.
No. 21-133).

On May 10, 2023, Defendant filed his pending Motion to Suppress Evidence and supporting brief.[1]  (Doc. 85, Doc. 86).

On April 30, 2020, Defendant was involved in a traffic stop.  According to Defendant's Motion to Suppress Evidence, all of the evidence seized from Defendant and the vehicle Defendant was driving on April 30, 2020, was obtained in violation of Defendant's rights under the Fourth Amendment to the United States Constitution.  (*Id.*).  Defendant argues that the evidence, therefore, must be suppressed.  (*Id.*).

On May 21, 2023, the Government filed its response in opposition to Defendant's Motion to Suppress Evidence.  (Doc. 91).  The government argues in response: "Mr. Chapman claims in his motion that the traffic stop was extended without a sufficient justification and that the search of the car was unjustified. These claims lack factual and legal merit. The motion should be denied. No evidence should be suppressed."  (*Id.* at 1).

On June 2, 2023, Defendant filed a "Reply to Government Response to Pretrial Motion." (Doc. 112).

On June 6, 2023, an evidentiary hearing was held on Defendant's Motion to Suppress Evidence ("Suppression Hearing").  (Doc. 118).

Accordingly, Defendant's Motion to Suppress Evidence is fully briefed and ripe for adjudication.

## II.    FACTUAL FINDINGS

The Court's factual findings are based on the evidence and testimony submitted by the parties with respect to Defendant's Motion to Suppress Evidence.

---

[1] Forthwith, for ease of reference, the Court will only cite to the document numbers related to Crim. No. 21-73.

**A. Police Officers Joyce and Denis's Body-Worn Camera Video/Audio Recordings**

In support of its response to Defendant's Motion to Suppress Evidence, the Government submitted the body-worn camera video/audio recordings of Pittsburgh Police Officers Daniel Joyce ("officer Joyce") (Doc. 91-1) and John Denis ("Officer Denis") (Doc. 91-2). Officers Joyce and Denis are the two police officers who, on April 30, 2020, initiated the traffic stop of a silver Kia sedan owned by Persia Kenney ("Ms. Kenney") which was being driven by Defendant at the time of the stop.

At the Suppression Hearing, the Court explained that it had reviewed the two body-worn camera video/audio recordings in advance of the Suppression Hearing.

### 1. *Officer Joyce's body-worn camera video/audio recording*

Relevant to Defendant's Motion to Suppress Evidence, Officer Joyce's body-worn camera video/audio recording shows the following.

Officers Joyce and Denis initiated a traffic stop of a silver Kia.  T01:11:43.

Officer Joyce approached the driver's side of the Kia.  T01:11:54.  Defendant was the driver.  T01:11:56.

The Kia's driver side window was down.  T01:11:59.  Officer Joyce explained to Defendant that he was being stopped because his high beams were on, and his left brake light was out.  T01:12:01.

Officer Joyce pointed out to Defendant that he could see on the Kia's dashboard the blue light that indicated that the Kia's high beams were on, and explained that the lights "blinded me."  T01:12:07, T01:12:11.

Officer Joyce asked Defendant for his identification.  T01:12:13.  Defendant did not have a drivers' license with him, but identified himself as Randale Chapman.  T01:1214.

Officer Joyce asked Defendant whose vehicle was the Kia.  T01:12:34.  Defendant responded "hers," referring to the Kia's passenger, Ms. Kenney.  T01:12:35.

Officer Joyce asked for the Kia's registration.  T01:12:36.  Ms. Kenney offered Officer Joyce her identification, which Officer Joyce accepted.  T01:13:26.  Ultimately, Ms. Kenney could not find the registration for the Kia.

Officer Joyce also got identification information from Defendant – address, date of birth, and social security number.  T01:13:08.

Officer Joyce returned to his police vehicle to verify the information provided by Defendant and Ms. Kenney on his police car's computer and with the dispatcher (thus beginning the dialogue with the dispatch service about Defendant having issues with a driver's license and outstanding bench warrant).  T01:13:58.  While reviewing the information on his computer, a dispatcher speaks to Officer Joyce over the officer's radio, to which Officer Joyce responds: "I'm reading it."  T01:19:26.  Defendant and Ms. Kenney remained in the Kia.

When Officer Joyce exited his police vehicle, he asked Officer Ryan Tranter ("Officer Tranter"), who had come on scene, and who was now stationed on the drivers' side of the Kia, to have Defendant exit the Kia.  T01:21:06.

As Defendant exited the Kia, Officer Tranter asked Defendant if he had any weapons, which Defendant said "no."  T01:21:12.  Officer Tranter patted Defendant down, and Defendant walked to the back of the Kia, where Officer Joyce was standing.  T01:21:25.

In this new position, Officer Joyce explained to Defendant that there were a few issues and, asked Defendant if he was on probation.  T01:21:40.  Defendant said "yes."  T01:21:40.

Officer Joyce then asked if Defendant had a license.  T01:21:41.  Defendant said "yes," and offered to get a photo of his driver's license for Officer Joyce.  T01:21:47.  Officer Joyce accepted the offer, explaining that he had received conflicting information about Defendant having a license; it came up both that Defendant's license was suspended, and that Defendant had a learner's permit.  T01:21:58.

Defendant, who had his cell phone with him, then made a phone call, and told the female who answered, to take a photo of his license for him and send it to him.  T01:22:18.

At one point, while Defendant was talking on his cell phone about obtaining a photo of his driver's license, it was unclear to Officer Joyce if Defendant was speaking to the female on the phone or Ms. Kenney.  T01:22:40.  Officer Joyce asked Defendant if he was speaking to Ms. Kenney.  T01:22:40.  Defendant responded "no."  T01:22:40.  Officer Joyce then asked Defendant if he was speaking to a "different person," "back home," and if Ms. Kenney was a "side chick."  T01:22:46.  Defendant said "yes," then "no," explaining that Ms. Kenney was "just a good friend."  T01:22:51.  Officer Joyce then explained to Defendant that he had asked because he did not want to cause Defendant any "life home drama" issues.  T01:23:00.

While still waiting for Defendant to provide Officer Joyce with a photo of Defendant's driver's license, Officer Joyce then asked Defendant for what was Defendant on probation.  T01:23:09.  Defendant's answer was "indictment".  T01:23:12.

While still waiting for Defendant to provide Officer Joyce with a photo of Defendant's driver's license, Officer Joyce then asked Defendant if there was anything illegal in the car.  T01:23:33.  Defendant nodded no. T01:23:36.  Officer Joyce then asked, "no drugs?".  T01:23:37.  Defendant said "no drugs" and that it was "her" car, meaning Ms. Kenney.  T01:23:39.

Defendant then showed Officer Joyce a photo of his driver's license that had been sent on his phone.  T01:24:00.  Officer Joyce looked at the photo on Defendant's phone, and then returned the phone to Defendant.  T01:24:08.

Officer Joyce then asked Defendant a series of drug-related questions, which Defendant answered:

"Do you smoke"?  T01:24:12.  "Yes".  T01:24:13.

"How Often"?  T01:24:13.  Defendant answered, but his answer was not clear. T01:24:16.

"Is that the only thing"?  T01: 24:18.  "Yes".  T01:24:19.

"So, no heroin"?  T01:24:20.  "No".  T01:24:22.

"No crack"?  T01:24:23.  Defendant nods no.  T01:24:24.

"Weed in the car"?  T01:24:24.  Defendant nods no. T01:24:25.

"Smoke today"?  T01:24:28.  "Yes".  T01:24:28.

"Smoke recently"?  T01:24:31.  "Yes".  T01:24:32.

"Smoke in the car"?  T01:24:34.  "Yes".  T01:24:34.

"Weed in the car"?  T01:24:36.  "No".  T01:24:36.

Officer Joyce then stated to Defendant his observation of the "smell of that."  T:01:24:40.

Officer Joyce then explained to Defendant that there is a "small warrant" out for Defendant, related to old traffic law violations.  T01:24:55.  This statement prompted a conversation between Officer Joyce and Defendant about the warrant, including Defendant's comment that he would not have been released from custody if he had an active warrant. T01:24:59.

Officer Joyce then explained that he wants to make sure there is nothing else in the car. T01:25:38.

Officer Joyce asked Officer Denis to have Ms. Kenney step out of the vehicle. T01:26:03.

Officer Joyce explained to Defendant that he wanted to check on one thing with Defendant's license.  T01:26:08.

While waiting for Ms. Kenney to exit the Kia, Officer Joyce asked Defendant "when did you get home?," and Officer Joyce and Defendant had a conversation about Defendant's time in prison.  T01:26:34.

Ms. Kenney exited the Kia.  T01:27:00.

Officer Tranter began searching inside the Kia.  T01:27:02.  Officer Denis searched the vehicle as well.  T01:27:30.

While Ms. Kenney was standing at the back of the Kia, Officer Joyce asked her, in front of Defendant, "is there anything illegal inside of the car?"  T01:27:33.  Ms. Kenney responded "no, there's not."  T01:27:35.  Officer Joyce then asked, "any drugs at all?"  T01:27:38.  Ms. Kenney nodded "no."  T01:27:39.  Officer Joyce then explained to Ms. Kenney that there was a "small smell of marijuana coming from the car" that got them "to this point," and also there was an issue with Defendant having a warrant that had to be looked into.  T01:27:43.

Both Defendant and Ms. Kenney periodically turned to watch the search of the Kia. T01:27:53, T01:28:02, T01:28:12, T01:28:25, T01:28:37.  Defendant then, without warning, fled from the scene of the traffic stop.  T01:28:46.

Officer Joyce yelled, "runner, foot pursuit," and Officers Tranter and Denis gave chase. T01:28:47.

Officer Joyce told Ms. Kenney to stay where she was (which she did), called in the foot pursuit, took the keys from the Kia's ignition, got into his police vehicle, and started to chase Defendant as well.  T01:28:49.

Officer Joyce quickly was told over his radio that Defendant was in custody.  T01:29:22.

Officer Denis asked Officer Joyce if someone was with the car.  T01:29:41.

Officer Joyce returned to Ms. Kenney and the Kia.  T01:30:22.

Upon his return, Officer Joyce asked Ms. Kenney some follow-up questions, and indicated that since there was no reason for Defendant to run based on the stop, now he's "more curious about what else is going on."  T01:30:45.

Officer Denis is heard saying "I got it."  T01:32:01.  Officer Denis then told Officer Joyce to detain Ms. Kenney, Ms. Kenney was placed in handcuffs by Officers Joyce and Denis, Officer Joyce indicated on his radio that a firearm had been recovered, and Officer Denis returned to the driver's side of the Kia.  T01:32:13.

Officer Joyce explained to Ms. Kenney that she was not under arrest, she was just detained, and read Ms. Kenney her *Miranda* rights.  T01:33:23.

Officer Joyce then spoke with Officer Tranter.  T01:35:50.  Officer Tranter stated that he had not seen the firearm when he was searching the Kia because he was focused on a bag in the car that seemed of interest to both Defendant and Ms. Kenney.  T01:35:54.

Officer Joyce stated to Officer Tranter that he could "smell it a little bit and they were trying to mask it."  T01:36:47.

Officer Joyce also stated to Officer Tranter that both Defendant and Ms. Kenney kept looking at the car while it was being searched.  T01:36:57.

Ultimately, Ms. Kenney was unhandcuffed and told that she was free to leave. T01:43:49.

### 2. *Officer Denis's body-worn camera video/audio recording*

Relevant to Defendant's Motion to Suppress Evidence, Officer Joyce's body-worn camera video/audio recording shows the following.

When Officers Joyce and Denis initiated the traffic stop, Officer Joyce first approached the Kia, while Officer Denis informed dispatch of the traffic stop.  T01:10:31.

When Officer Denis approached the Kia, on the passenger side, Officer Joyce already was talking to the driver at the driver's side window.  T01:11:00.

Officer Denis took up a post on the passenger side of the Kia.  T01:11:06.  Ms. Kenney was seated in the front passenger seat.  T01:11:20.

Officer Tranter arrived on scene, and stood by the driver's side of the Kia.  T01:14:33.

Officer Denis remained stationed at the passenger side of the Kia until Officer Joyce asked Officer Denis to remove Ms. Kenney from the Kia.  T01:24:42.  He did so, and asked Ms. Kenney if she had any weapon on her.  T01:25:40.  0Ms. Kenney responded "no."  T01:25:42. Officer Denis then briefly patted Ms. Kenney down for weapons.  T01:25:52.

While Ms. Kenney was at the back of the Kia, Officer Denis opened the front passenger door of the Kia, and began searching the Kia.  T01:26:08.  Officer Tranter can be seen searching the Kia from the driver's side of the vehicle.  T01:26:27.

The officers had not found any evidence of illegal activity when Officer Joyce can be heard yelling "runner, foot pursuit."  T01:27:28.  At this point, Officer Denis began chasing after Defendant down a dark street.  T01:27:29.

Defendant quickly was apprehended, and placed in handcuffs.  T01:27:47.

Officer Denis yelled out "is someone with the car?," and said "go get it, get the car." T01:28:22, T01:28:27.

Officer Denis searched Defendant, and found pills in Defendant's pocket.  T01:29:06.

Officer Denis asked Defendant if there is a gun in the car.  T01:29:11.  Defendant did not answer.

As Officer Denis and Defendant walked to the transport van, Officer Denis again asked fellow officers if someone was with the car, and yelled "get the car, get the car."  T01:29:27, T01:28:37.

Once Officer Denis and Defendant were at the back of the transport van, Defendant then, without Officer Denis asking Defendant any questions, spontaneously uttered, "It's mine, whatever you all find."  T01:30:14.

Officer Denis then left Defendant at the transport van, and, with a handful of currency and baggies, walked directly to the driver's side of the Kia (the door was open), looked under the driver's seat, and said, "I got it."  T01:30:21.

Officer Denis then told Officer Joyce to detain Ms. Kenney, who was nearby, and together Officers Joyce and Denis placed handcuffs on Ms. Kenney.  T01:30:53.

Officer Denis then put on gloves, returned to the Kia, and pulled a gun out from under the driver's seat.  T01:31:21.  Officer Denis proceeded to further search the Kia, as did other police officers.  T0131:55.

### B.  Law Enforcement Records

### 1.  *Officer Joyce's City of Pittsburgh Bureau of Police Investigative Report (Doc. 91-3)*

The Government submitted Officer Joyce's City of Pittsburgh Bureau of Police Investigative Report in support of its opposition to Defendant's Motion to Suppress Evidence.  (Doc. 91-3).

In the Investigative Report, Officer Joyce explained the following.

Officers Joyce and Denis were in their police vehicle, patrolling the Manchester neighborhood of Pittsburgh, when they saw a Kia approach them with its high beams on, which blinded Officer Joyce's eyesight.  (*Id.* at 2).

They followed the Kia, and noticed that the left brake light was out.  Accordingly, Officers Joyce and Denis decided to initiate a traffic stop of the Kia.  (*Id.*).

They activated the siren and lights of the police car, and initiated a traffic stop of the Kia at Fulton and Steadman Streets.  (*Id.*).

As the driver (who was Defendant) pulled over, Officer Joyce noticed the driver was moving side to side and leaned to his right side, and dipped his right shoulder.  (*Id.*).

Both Officer Joyce and Officer Denis approached the stopped Kia.  (*Id.*).  Officer Joyce approached the driver, and explained the traffic stop.  (*Id.*).

While standing at the driver's side window, Officer Joyce could smell the odor of marijuana emanating from the Kia.  (*Id.*).  Office Denis, standing at the passenger side window, also could smell the odor of marijuana emanating from the vehicle.  (*Id.*).

Defendant identified himself as Randale Chapman, date of birth November 2, 1987, and explained "he lives here 1305 Fulton."  (*Id.*).

Officer Joyce asked Defendant if he had his ID, Defendant replied "No, I left it at my other house."  (*Id.*).  Officer Joyce repeated to Defendant that Defendant had told him he lived at 1305 Fulton.  (*Id.*).  Defendant explained that he lived at 1305 Fulton, but also stays at another place in the Southside.  (*Id.*).

At this point in time, Officer Tranter arrived on the scene as backup.  (*Id.*).  When Officer Tranter approached the Kia, he also stated that he could smell marijuana.  (*Id.*).

Officer Joyce asked Defendant whose vehicle was the Kia.  (*Id.*).  Defendant responded "hers," referring to the Kia's passenger, Persia Kenney.  (*Id.*).

Officer Joyce asked for the Kia's registration.  (*Id.*).  Ms. Kenney offered Officer Joyce evidence of her identification, which Officer Joyce accepted.  (*Id.*).  Officer Joyce collected Defendant's identification information while Ms. Kenney looked for, but could not find, the Kia's registration.  (*Id.*).

Armed with Defendant's information, and Ms. Kenney's identification, Officer Joyce returned to his vehicle to verify the information provided.  (*Id.*).

Ms. Kenney's information came back with negative for wants and warrants, and the vehicle registration was valid. (*Id.*).

Running Defendant's information through the MDT, however, a NCIC hit came back for Defendant.  (*Id.*).

Officer Joyce notified the officers on scene of the findings and told Officer Tranter to have Defendant step out of the Kia.  (*Id.*).

Officer Tranter had Defendant exit from the Kia, and patted Defendant down.  (*Id.*).

Officer Joyce then told Defendant to step to the rear of the Kia to talk to him.  (*Id.*).

They ended up near Officer Joyce's passenger side bumper, with Officer Joyce standing on the curb, and Defendant standing by the police car, facing Officer Joyce.  (*Id.*).

Officer Joyce placed himself and Defendant in those positions purposefully, so he could watch both Defendant's body language and the Kia.  (*Id.* at 2-3).

Officer Joyce noticed that Defendant kept looking at the Kia, particularly towards the driver's side of the vehicle.  (*Id.* at 3).

Officer Joyce explained to Defendant that there possibly was a minor warrant for Defendant and they would need to check that out, and that if it was what Officer Joyce thought it was, then it would be no big deal and Officer Joyce would not need to do anything.  (*Id.*).

Officer Joyce also asked Defendant if he was on probation (because when Officer Joyce ran Defendant's information, a notification came back stating Defendant was on probation). (*Id.*).  Defendant confirmed that he was on probation.  (*Id.*).

Officer Joyce also asked Defendant if he had any issues with traffic tickets because that is what the NCIC hit came back for.  (*Id.*).  Defendant answered "that must be from a long time ago because he thought he had cleared all that up."  (*Id.*).

Officer Joyce also asked Defendant if there was anything illegal in the Kia, any drugs, heroin, crack, and weed.  (*Id.*).  Defendant answered no to all these questions.  (*Id.*).

While Officer Joyce and Defendant were talking, Defendant periodically would keep looking back at the Kia.  (*Id.*).

Officer Joyce explained to Defendant that the officer could smell the odor of marijuana come from the Kia.  (*Id.*).  Officer Joyce stated to Defendant that "if there is any marijuana in the vehicle it can be no big deal and work it out I don't want this to be a big deal for him."  (*Id.*). Defendant replied that there was no marijuana in the Kia, but that he smokes "some."  (*Id.*). Officer Joyce then asked Defendant a few questions regarding his statement.  (*Id.*).

Officer Joyce then told Officer Denis to ask Ms. Kenney to step out of the Kia.  (*Id.*).  He did so, and Ms. Kenney came to the back of the Kia to talk to Officer Joyce, leaning back on the Kia while they talked.  (*Id.*).

Officer Joyce explained to Ms. Kenney, since the Kia was her vehicle, that the officers could smell marijuana, and that they were going to check.  (*Id.*).

Officer Joyce asked Ms. Kenney if there was anything illegal in the Kia, and she replied "no." (*Id.*).

While Officer Joyce was telling Ms. Kenney what was going to happen, Defendant began to run down the street. Officers Denis and Tranter gave chase on foot. (*Id.*).

Officer Joyce called out the pursuit on the radio, went to the Kia, turned off the ignition, took the keys and got into his patrol vehicle. (*Id.*).

Officer Joyce drove to the next street and saw Officers Denis and Tranter taking Defendant into custody. (*Id.*). Officer Tranter had deployed his Taser during the incident, noted it on the radio, and informed supervisor Sargent Mercurio, who responded to the scene. (*Id.*).

Officer Joyce returned to the scene of the traffic stop, where Ms. Kenney was waiting in the same spot. (*Id.*). No one else was seen near the Kia. (*Id.*).

Officer Denis returned to the scene, and searched the Kia. (*Id.*). He found a firearm under the driver's seat, and marijuana. (*Id.*).

Officer Denis searched Defendant. (*Id.*). Officer Denis found in Defendant's pants pocket a large bundle of cash, which was wrapped in a particular way that is consistent with drug sale transactions: "[t]he bundle had two hundred dollar bills on the outside, and then in-between those were 16 bundles in various amounts. Those amounts included $30, 600, 38, 20, 20, 20, 100, 10, 90, 10, 10, 45, 200, 9." (*Id.*). Officer Denis also found in the same pocket: (1) 2 knotted baggies containing Percocet 30 mg pills (1 baggie contained 15.5 pills and 1 baggie contained 4 pills); (2) a baggie containing 14 THC gummie bears; and (3) 2 baggies containing MDMA pills with powder (1 baggie contained 3 pills and 1 baggie contained 12 pills). (*Id.*). A black iPhone was also recovered from Defendant. (*Id.*).

Officer Joyce read Ms. Kenney her Miranda rights and asked her a few questions.  (*Id.* at 4).  He asked Ms. Kenney if she knew anything about the firearm that was inside her vehicle. (*Id.*).  Ms. Kenney stated that she did not know about it and did not know Defendant had a firearm.  (*Id.*).

Officers placed Defendant in the transport van, which was driven by Officers Lee Chong and Rendina.  (*Id.*).  Officer Denis then read Defendant his Miranda rights.   (*Id.*).

Ms. Kenney was released from the scene.  (*Id.*).

The officers thoroughly searched their marked patrol unit at the beginning of their shift for contraband, weapons and/or implements of escape; which was negative for any such items. (*Id.*).  Prior to transporting Chapman to the Allegheny County Jail, Officers re-searched their marked patrol unit.  (*Id.*).  No contraband, weapons and/or implements of escape were found. (*Id.*).

Upon completion of the transport and removal of Chapman, officers searched their marked patrol unit for a third time, and no contraband, weapons and/or implements of escape were located.  (*Id.*).

**2. *Officer Denis' City of Pittsburgh Bureau of Police Supplemental Report*  (*Doc. 91-4*)**

The Government submitted Officer Denis' City of Pittsburgh Bureau of Police Supplemental Report in support of its opposition to Defendant's Motion to Suppress Evidence. (Doc. 91-4).

In the Supplemental Report, Officer Denis explained the following.

While approaching the Kia with Officer Joyce, Officer Denis could immediately smell a strong odor of marijuana.  (*Id.* at 2).  Further, as Officer Joyce ran Defendant's information, it

was clear that Defendant was nervous; "[h]is hands shook as he smoked his black and mild cigar." (*Id.*).

After Defendant and Ms. Kenney exited the Kia, Officers Denis and Tranter began a search of the Kia. (*Id.*). It was at this time that Officer Joyce told them that Defendant was running from the scene. (*Id.*). Officers Denis and Tranter gave chase on foot, caught up with Defendant, and Officer Tranter used his taser on Defendant. (*Id.*). The taser caused Defendant to fall to the ground, but Defendant then began to push himself up, and which time Officer Denis delivered 2 knee strokes to Defendant's torso. (*Id.*). Officers Denis and Tranter yelled for Defendant to put his hands behind his back, and Defendant complied. (*Id.*).

The officers then handcuffed Defendant, and Officer Denis searched Defendant. (*Id.*). Said search resulted in Officer Denis recovering from Defendant's front left pants pocket: (1) $1402 in United States currency; (2) a knotted baggie with 15.5 30 mg Percocet pills; (3) a knotted baggie containing 4 30 mg Percocet pills; (4) a baggie containing 12 MDMA pills and powder; (5) a baggie containing 3 MDMA pills and powder; (6) a baggie containing 14 THC gummies; and (7) a black iPhone. (*Id.*).

While Officer Denis walked Defendant to the police transport van, Defendant spontaneously uttered that everything in the vehicle was his.

Officer Denis returned to the Kia, and searched it. (*Id.*). He recovered a silver Astra .40 cal pistol from under the driver's seat and loose marijuana from the driver's seat map pocket. (*Id.*).

Officer Denis then read Defendant his Miranda rights. (*Id.*).

16

### 3. *May 2020 AOPC Warrant Summary*

The Government also submitted an AOPC Warrant Summary of Defendant's active

warrants dated May 26, 2020, in support of its opposition to Defendant's Motion to Suppress

Evidence.  (Doc. 91-5).  The AOPC Warrant Summary indicates that as of May 26, 2020, there

was an active bench warrant for Defendant, dated November 23, 2011, related to traffic

violations.  (*Id.*).

### C.  Officer Joyce's Testimony at Suppression Hearing

Officer Joyce credibly testified to the following at the June 6, 2023 Suppression Hearing.

Officer Joyce works as a City of Pittsburgh police officer, and has been a police officer

for 8 years.  (Tr. at 6).

On April 30, 2020, at approximately 9:10 P.M., Officer Joyce and Officer Denis were on

patrol in a marked police car in the Zone 1 area of Pittsburgh, which is the Manchester

neighborhood located in the North Side part of the City of Pittsburgh.  (*Id.*)

Officer Joyce was driving the police car when an oncoming vehicle's high beams blinded

Officer Joyce.  (*Id.* at 7).  They followed the vehicle, saw that the vehicle's left brake light was

out, and initiated a traffic stop.  (*Id.*).

Defendant was the driver of the vehicle.  There was a front seat passenger.  (*Id.*).

Within the first few minutes of the traffic stop, before Officer Joyce asked Defendant to

exit the vehicle, he was aware that Defendant had an active outstanding AOPC warrant and that

there was an issue as to whether Defendant had a valid driver's license.  (*Id.* at  9, 14).  Officer

Joyce was made aware of this information through the mobile computer inside his police vehicle.

(*Id.* at 9).

After Defendant exited the vehicle, the outstanding warrant and the driver's license issues were discussed with Defendant.  (*Id*. at 10, 17).  Officer Joyce also asked Defendant if he was on parole or supervised release.  (*Id*. at 12-13).  Officer Joyce also asked Defendant whether the passenger, Ms. Kenney, was Defendant's "side chick," and explained that he didn't want to get Defendant in trouble.  (*Id*. at 13).  Officer Joyce spoke with Defendant about his prior conviction. (*Id.*).

At this point, when Defendant was removed from the Kia, and Officer Joyce started asking Defendant questions, the active warrant issue was still being investigated. (*Id.* at 17).

After Officer Joyce talked to Defendant about the outstanding warrant, Ms. Kenney was removed from the vehicle, and shortly after that the vehicle began to be searched.  (*Id*. at 14).

At the time Ms. Kenney stepped out of the vehicle, the police still were investigating warrant and driver's license.  (*Id.* at 18-19).

The decision to search the vehicle for marijuana was made by "all of us."  (*Id*. at 15). Officer Joyce believed that the decision to search would have been communicated between himself and Officer Denis, but he did not recall if words were exchanged or there was an understanding.  (*Id.*).  Officer Joyce could not remember if, in reviewing the body-worn camera video/audio recordings, he saw where he and Officer Denis communicated about the search of the Kia.  (*Id.* at 15-16).

With respect to the marijuana smelled by Officer Joyce, he could not tell if it was burnt marijuana; "You know, it's a very hard description or distinction to say between burnt and fresh marijuana.  Over the course of these years, the type of marijuana out there and the strain is a very pungent, strong smell can come from a very small amount of marijuana."  (*Id.* at 16-17).

When Ms. Kenney was out of the Kia, Officer Joyce watched Defendant and Ms. Kenney while the Kia was being searched for officer safety.  (*Id*. at 18).

Defendant then fled from the scene of traffic stop by running away.   (*Id*. at 21).  At the time Defendant fled, Officer Joyce had not completed his investigation, which required: (1) the bench warrant information being run through his dispatch service, who would reach out to the original agency to find out if the warrant was going to continue to be an active warrant and that Defendant needed to be taken into custody to be processed through the warrant; and (2) running through JNET with his dispatcher to confirm Defendant's license status.  (*Id.* at 19).

Defendant was caught within 60 seconds, his person was searched, and then the vehicle he had been driving was searched.  (*Id*. at 8).  Marijuana was found. (*Id*. at 16).

## III.    CONCLUSIONS OF LAW

### A.  ***Defendant's Rights Under the Fourth Amendment Were Not Violated During the Traffic Stop and Search of the Kia on April 30, 2020***

Defendant first argues that his Fourth Amendment right not to be subjected to an unreasonable seizure was violated because the traffic stop that occurred on April 30, 2020, was unreasonably prolonged.  Thus, Defendant contends that all evidence seized after the traffic stop was unlawfully extended must be suppressed:

> The traffic stop was unreasonably prolonged when law enforcement began to question Mr. Chapman about his criminal record, where he has been incarcerated, the nature of his relationship with Ms. Kenney and other matters not pertinent to the traffic stop.  It failed to "complete the mission'[footnote 2] that was the purpose of the stop, a broken taillight and improper use of high beams.
>
> [footnote 2: *Rodriguez* [*v. U.S*., 578 U.S. 348, 351-352 (2015)].

(Doc. 86 at 3-4).

Defendant also argues that his Fourth Amendment right not to be subjected to an unreasonable search was violated on April 30, 2020, when the police officers searched the Kia without having probable cause to conduct the search of the vehicle.  (*Id*. at 6).

The Government responds: "In this case, the duration of the traffic stop was not extended at all by any unrelated investigation because the mission of the traffic stop was clearly not completed at the time Mr. Chapman ran away from the officers."  (Doc. 91 at 6-7).

Additionally, the Government contends that neither the firearm nor the marijuana was found during the initial search of the Kia prior to Defendant fleeing, and the subsequent search, after Defendant was apprehended was supported by probable cause to conclude that the Kia contained contraband or evidence of a crime, and thus, was lawful under the automobile exception to the Fourth Amendment's warrant requirement.  (*Id.* at 8-10).

Further, the Government argues that the subsequent search of the Kia, after Defendant fled, was lawful because it was a search incident to Defendant's arrest for escape and drug crimes. (*Id.* at 10-11).

Finally, The Government posits: "[u]nder federal law, the marijuana odor was a sufficient alternative basis for the duration of the traffic stop and the car search."  (*Id.* at 6).

For the following reasons, the Court finds that Defendant's rights under the Fourth Amendment were not violated during the traffic stop and search of the Kia on April 30, 2020.

### 1.  *The initial traffic stop was lawful*

"Traffic stops are classified as a type of *Terry* stop, and may be initiated based on a reasonable suspicion that a traffic violation has occurred."  *U.S. v. Green*, 897 F.3d 173, 178 (3d Cir. 2018) (citing *Navarette v. California*, 572 U.S. 393 (2014)).  A traffic stop is reasonable "when an objective review of the facts shows that an officer possessed specific, articulable facts

that an individual was violating the traffic law at the time of the stop. This standard is not particularly rigorous, as no traffic law need actually have been broken, nor does the stopping officer have to be correct regarding the facts." *U.S. v. Fleetwood*, 235 F. App'x 892, 895 (3d Cir. 2007) (cleaned up).  The officer "need only produce facts establishing that [he] reasonably believed that a violation had taken place." *Id.   See also U.S. v. Delfin-Colina*, 464 F.3d 392, 398 (3d Cir. 2006) (explaining, "a traffic stop will be deemed a reasonable 'seizure' when an objective review of the facts shows that an officer possessed specific, articulable facts that an individual was violating a traffic law at the time of the stop. In other words, an officer need not be factually accurate in her belief that a traffic law had been violated but, instead, need only produce facts establishing that she reasonably believed that a violation had taken place").

Here, Officer Joyce and Officer Denis's investigative reports and Officer Joyce's credible testimony at the Suppression Hearing clearly establishes that the officers had an objective reasonable suspicion that the driver of the Kia (Defendant) had committed 2 traffic violations at the time they stopped the Kia on April 30, 2020: (1) the improper use of multiple-beam road lighting equipment, in violation of 75 Pa.C.S.A. § 4306(a); and (2) operating a vehicle with a nonfunctioning brake light, in violation of 75 Pa.C.S.A. § 4303(b).

> ### 2.  ***Defendant's Fourth Amendment right not to be unreasonably seized was not violated because the traffic stop had not been unreasonably prolonged at the time Defendant fled from the traffic stop***

Again, Defendant argues that his Fourth Amendment right not to be subjected to an unreasonable seizure was violated because the traffic stop was unreasonably prolonged, and thus, all evidence seized after the traffic stop was unlawfully extended must be suppressed:

> The traffic stop was unreasonably prolonged when law enforcement began to question Mr. Chapman about his criminal record, where he has been incarcerated, the nature of his relationship with Ms. Kenney and other matters not pertinent to

the traffic stop.  It failed to "complete the mission'[footnote 2] that was the purpose of the stop, a broken taillight and improper use of high beams.

[footnote 2: *Rodriguez* at 351-352.]

([Doc. 86 at 3-4](#)).

To which, the Government responds: (1) "[i]n this case, the duration of the traffic stop was not extended at all by any unrelated investigation because the mission of the traffic stop was clearly not completed at the time Mr. Chapman ran away from the officers;" and (2) "[u]nder federal law, the marijuana odor was a sufficient alternative basis for the duration of the traffic stop".  ([Doc. 91 at 6-7](#)).

In *United States v. Clark*, 902 F.3d 404, 409–10 (3d Cir. 2018), the United States Court of Appeals for the Third Circuit explained:

> A traffic stop, even if brief and for a limited purpose, "constitutes a 'seizure' of 'persons' within the meaning of [the Fourth Amendment]." *Whren v. United States*, 517 U.S. 806, 809–10, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996). Though a stop may be lawful at its inception (as the parties agree is the case here), it could become "unreasonable," and thus violate the Constitution's proscription, at some later time. *Illinois v. Caballes*, 543 U.S. 405, 407, 125 S.Ct. 834, 160 L.Ed.2d 842 (2005). We review objectively the officer's rationale, by looking to the facts and circumstances confronting him or her, to determine whether his or her actions during the stop were reasonable. *United States v. Delfin-Colina*, 464 F.3d 392, 397–98 (3d Cir. 2006).
>
> The Supreme Court *in Rodriguez* directs our attention to the mission of the traffic stop to determine whether it is impermissibly lengthened. 135 S.Ct. at 1614–16. A stop becomes unlawful when it "last[s] . . . longer than is necessary" to complete its mission, the rationale being that the "[a]uthority for the seizure . . . ends when tasks tied to the [mission] are[,] or reasonably should have been[,] completed." *Id.* at 1614. To prolong a stop beyond that point, the officer must have acquired reasonable suspicion during the mission to justify further investigation. *Id.* at 1615. There is no *de minimis* exception to this rule. *Id.* at 1616.
>
> To repeat, a traffic stop's mission is "to address the traffic violation that warranted the stop and attend to related safety concerns." *Id.* at 1614 (citation omitted). "Beyond determining whether to issue a traffic ticket," this includes "ordinary inquiries incident to [the traffic] stop." *Id.* at 1615 (citation omitted) (alteration in original). These incidental inquiries typically involve checking the driver's license and any outstanding warrants against the driver, as well as inspecting the vehicle's

registration and insurance. *Id.* They are considered part of the traffic stop's mission because they serve its ultimate objective—to ensure roadway safety. *Id.* Tasks tied to officer safety are also part of the stop's mission when done out of an interest to protect officers. *Id.* at 1616.

*Clark*, 902 F.3d at 409–10.

The Court of Appeals for the Third Circuit "call[s] the time at which a stop is measurably extended—'when tasks tied to the traffic stop are completed or reasonably should have been completed'—the "'*Rodriguez* moment.'" *U.S. v. Burrus*, 845 F. App'x 187, 189 (3d Cir. 2021) (*quoting U.S. v. Garner*, 961 F.3d 264, 270 (3d Cir. 2020)).

### a. The traffic stop was not unreasonably prolonged because the tasks tied to the mission of the traffic stop had not been completed, nor reasonably should have been completed, at the time Defendant fled from the traffic stop

Turning to the facts of this case, the Court first finds that Officer Joyce's investigation of Defendant's driver's license status and active bench warrant were related to the mission of the traffic stop. *Clark*, 902 F.3d at 410.

The Court further finds that Officer Joyce credibly testified at the Suppression Hearing that at the time Defendant choose to flee from the traffic stop, effectively ending the traffic stop: (1) the bench warrant information about Defendant needed to be run through his dispatch service, who would then have to reach out to the original agency to find out if the warrant was going to continue to be an active warrant and Defendant needed to be taken into custody to be processed through the warrant; and (2) Defendant's driver's license information needed to be run through JNET with his dispatcher to confirm Defendant's license status.

Finally, based upon Officer Joyce's above-detailed credible testimony, the Court concludes that these necessary tasks to the mission of the traffic stop had neither been completed,

nor reasonably should have been completed, at the time Defendant fled from the traffic stop.   In

other words, when Defendant fled from the scene, the *Rodriguez* moment had not yet occurred.[2]

Thus, because the traffic stop had not been unreasonably prolonged when Defendant fled

from the traffic stop, Defendant's Fourth Amendment right not to be unreasonably seized was

not violated.

> b. ***The traffic stop also was not unreasonably prolonged because upon
> approaching the Kia and its occupants at the start of the traffic stop, the officers
> had independent reasonable suspicion that Defendant and Ms. Kenney were
> illegally in possession of marijuana, which justified any further investigation***

The Court further finds that at this time in the traffic stop, law enforcement already

possessed independent reasonable suspicion that Defendant and Ms. Kenney were illegally in

possession of marijuana, having smelled marijuana when they first approached the Kia and its

occupants at the beginning of the traffic stop.[3]   *See Garner*, 961 F.3d at 271 (holding, officer

---

[2]The Court also notes that: (1) in light of the active warrant and driver's license status issues, which were part of the mission of the traffic stop, Officer Joyce's questions with respect to Defendant's criminal history were related to the mission of the traffic stop; (2) any questions Officer Joyce asked Defendant while Officer Joyce was waiting for Defendant to provide him with a photograph of his driver's license (which Defendant had volunteered to do), including Officer Joyce's innocuous, non-investigative question about Defendant's relationship with Ms. Kenny, could not have measurably extended the traffic stop.   *See U.S. v. Yusuf*, 993 F.3d 167, 183 (3d Cir. 2021) (holding that traffic stop was not prolonged because "the search for the insurance card and registrations was a plainly valid reason to continue the stop").

[3]To assess the existence of reasonable suspicion, courts "look at the totality of the circumstances of each case to see whether the detaining officer ha[d] a particularized and objective basis for suspecting legal wrongdoing."   *U.S. v. Arvizu*, 534 U.S. 266, 273 (2002) (internal quotation marks omitted).   As explained in *United States v. Goodrich*, 450 F.3d 552 (3d Cir. 2006):

> Reasonable suspicion is an 'elusive concept,' but it unequivocally demands that 'the detaining officers must have a particularized and objective basis for suspecting the particular person stopped of criminal activity.'   *United States v. Cortez*, 449 U.S. 411, 417–18, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981).   An officer's objective basis for suspicion must be particularized because the 'demand for specificity in the information upon which police action is predicated is the central teaching of this Court's Fourth Amendment jurisprudence.'   *Terry*, 392 U.S. at 22 n. 18, 88 S.Ct. 1868.   At the same time, we must allow 'officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person.'   *United States v. Arvizu*, 534 U.S. 266, 273, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002) (internal quotation marks omitted); *see also United States v. Nelson*, 284 F.3d 472, 476 (3d Cir.2002) . . .   In evaluating whether there was an objective basis for reasonable suspicion, we

"had reasonable suspicion to extend the stop based on information he obtained during the first few minutes of the traffic stop and before he engaged in any unrelated investigation."). It is well-established that:

> [i]n the Third Circuit, smelling marijuana alone, "if articulable and particularized, may establish not merely reasonable suspicion, but probable cause." *United States v. Ramos*, 443 F. 3d 308 (3d Cir. 2005) (citing *United States v. Humphries*, 372 F.3d 653 (4th Cir. 2004)). Where an officer is able to localize the source of marijuana to a person, the officer has probable cause to believe that person committed or has committed a crime. *Humphries*, 372 F.3d at 659.

*U.S. v. Leonard*, Crim. No. 21-461, 2022 WL 2068251, at *3 (E.D. Pa. June 8, 2022).[4]  *See also*

*U.S. v. Washington*, No. 20-2970, 2022 WL 17336207, at *2 (3d Cir. Nov. 30, 2022) (stating,

"[w]e have held that 'the smell of marijuana alone, if articulable and particularized, may

---

> consider 'the totality of the circumstances-the whole picture.' *Cortez*, 449 U.S. at 417, 101 S.Ct. 690.

*Goodrich*, 450 F.3d at 559.

[4] Defendant's contention to the contrary, that the smell of marijuana coming from the Kia, without other evidence of criminal activity, could not, as a matter of law, establish the requisite reasonable suspicion that criminal activity was afoot, in light of Pennsylvania's Medical Marijuana Act, 35 P.S. §§ 10231.101-10231.2210, and Pennsylvania case law, (Doc. 112 at 2), simply is incorrect because the law of the Commonwealth of Pennsylvania is not applicable to this federal case:

> [T]he Pennsylvania Medical Marijuana Act has no relevance in the federal question before this Court. Federal laws govern the admissibility of evidence in federal court. Whether a search or seizure is reasonable under the Fourth Amendment is a question of federal law and does not depend "on the law of the particular State in which the search occurs." *California v. Greenwood*, 486 U.S. 35, 43 (1988) (holding Fourth Amendment does not prohibit the warrantless search and seizure of garbage left for collection outside the curtilage despite possibly contrary California law); *United States v. Rickus*, 737 F. 2d 360 (3d Cir. 1984) (overruling the district court's application of state law to suppress the search of a car trunk). Further, this District has also recognized that under the Supremacy Clause, the federal Controlled Substances Act trumps the Pennsylvania medical marijuana statute. *United States v. Bey*, 341 F. Supp. 3d 528 (E.D. Pa. 2018) (J. Kearney) (defendant's possession and use of medical marijuana, though authorized under state law, violated the terms of his federal supervised release); *see also United States v. Schostag*, 895 F.3d 1025, 1028 (8th Cir. 2018) (same). Thus, the 2016 state statute has had no effect on the controlling federal law applicable to the issue at hand.

*Leonard*, 2022 WL 2068251, at *5.

establish not merely reasonable suspicion, but probable cause'") (*quoting Ramos*, 443 F.3d at 308).

The Court's conclusion that the officers had reasonable suspicion that Defendant and Ms. Kenney were illegally in possession of marijuana from the first minutes of the traffic stop is supported by the following evidence of record.  First, Officer Joyce's investigative report, which explains that when Officer Joyce first approached Defendant in the Kia and explained to Defendant the reasons why he had stopped the vehicle, both he and Officer Denis, who was standing at the passenger side window, could smell marijuana emanating from the vehicle, where Defendant and Ms. Kenney were located, and thereafter, when Officer Tranter arrived on scene and approached the Kia with the 2 passengers, Officer Tranter also stated that he smelled marijuana emanating from the vehicle.  (Doc. 91-3).  Second, Officer Denis's investigative report, which explains that when Officer Denis approached the Kia at the beginning of the traffic stop, he smelled marijuana emanating from the vehicle.  (Doc. 91-4).  Third, Officer Joyce's body-worn camera video/audio recording, which corroborates the statements in the officers' investigative reports, in that it shows: (1) at the start of the traffic stop, when Officer Joyce first approached the Kia, the driver's window was down, such that the three officers would have been able to smell any marijuana emanating from the Kia as they each approached the vehicle; and (2) upon having Officer Tranter remove Defendant from the Kia, Officer Joyce explained to Defendant, from the rear of the Kia, that his issues of concern were not just with Defendant's license and outstanding warrant, but also "the smell of that" (Officer Joyce later described the smell to Ms. Kenney as a "small smell of marijuana coming from the car").  *See* (Doc. 91-1 at T01:24:40, T01:27:42, T01:36:47, Doc. 91-3 at 2, Doc. 91-4 at 2).  Fourth, Officer Joyce

credibly testified that the type of marijuana out there, the strain, is very pungent, such that a strong smell can come from a very small amount of marijuana.  (Tr. at 17).

In so finding, the Court disagrees with Defendant's contention that the officers' statements about smelling marijuana when they first approached the Kia could not be credible because: (1) the police car's dash camera did not show either a joint being thrown out of the window of the Kia prior to it being stopped by the police in the dark or smoke emanating from the Kia as the officers approached the stopped car; (2) no marijuana cigarettes, burnt marijuana residue, or marijuana paraphernalia being found in the Kia once it was searched; and (3) the amount of marijuana found in the Kia was a small amount.   The pungent odor of any smoked item can linger in a vehicle for quite some time, and again, Officer Joyce credibly testified that the type of marijuana out there, the strain, is very pungent, such that a strong smell can come from a very small amount of marijuana.  (*Id.*).

Accordingly, there was independent reasonable suspicion that Defendant and Ms. Kenney were illegally in possession of marijuana that justified any additional investigation apart from tasks tied to the mission of the traffic stop.  Thus, the Court finds that the traffic stop had not been unreasonably prolonged when Defendant fled from the traffic stop, and thus, Defendant's Fourth Amendment right not to be unreasonably seized was not violated during the traffic stop.

### 3. *Defendant's Fourth Amendment right not to be subject to an unreasonable search was not violated when the officers initially searched the Kia because they had probable cause to believe that the Kia contained contraband/evidence of Defendant and Ms. Kenney's illegal possession of marijuana such that the search fell within the automobile exception to the Fourth Amendment's warrant requirement*

Defendant also argues that the search of the Kia violated his Fourth Amendment rights because it was premised solely on the smell of marijuana, and in light of Pennsylvania's Medical Marijuana Act, 35 P.S. §§ 10231.101-10231.2210, and Pennsylvania case law, "the odor of

marijuana 'may be a factor, but not a stand-alone one' in determining whether probable cause existed justifying a warrantless search." (Doc. 86 at 4).

In reviewing whether a warrantless search of a vehicle violates a defendant's Fourth Amendment right against unreasonable searches, in *United States v. Byrd*, 813 F. App'x 57 (3d Cir. 2020), the Court of Appeals for the Third Circuit explained:

> Under the automobile exception to the Fourth Amendment warrant requirement, officers may search a vehicle without a warrant if they have probable cause to believe it contains evidence of a crime. *United States v. Burton*, 288 F.3d 91, 100 (3d Cir. 2002). We assess probable cause under the totality of the circumstances and "from the standpoint of an objectively reasonable police officer." *Id.* at 99 (quoting *Ornelas v. United States*, 517 U.S. 690, 696, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996)); *Illinois v. Gates*, 462 U.S. 213, 238, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). Probable cause exists where the circumstances establish a "fair probability that contraband or evidence of a crime will be found" in the vehicle. *Burton*, 288 F.3d at 103 (quoting *Gates*, 462 U.S. at 238, 103 S.Ct. 2317).

*Byrd*, 813 F. App'x at 61.

Again, Pennsylvania law is not applicable to this federal case,[5] and it is well established that:

> [i]n the Third Circuit, smelling marijuana alone, "if articulable and particularized, may establish not merely reasonable suspicion, but probable cause." *United States v. Ramos*, 443 F. 3d 308 (3d Cir. 2005) (citing *United States v. Humphries*, 372 F.3d 653 (4th Cir. 2004)). Where an officer is able to localize the source of marijuana to a person, the officer has probable cause to believe that person committed or has committed a crime. *Humphries*, 372 F.3d at 659.

*Leonard*, 2022 WL 2068251, at *3. *See also Washington*, 2022 WL 17336207, at *2 (stating, "[w]e have held that 'the smell of marijuana alone, if articulable and particularized, may establish not merely reasonable suspicion, but probable cause'" (*quoting Ramos*, 443 F.3d at 308); *U.S. v. Lackey,* No. 20-2977, 2022 WL 313807, at *2 (3d Cir. Feb. 2, 2022) (explaining, "'[i]t is well settled that the smell of marijuana alone, if articulable and particularized, may

---

[5] *Id.*

establish not merely reasonable suspicion, but probable cause.' Both Officer Bates and Officer Rudy smelled the odor of marijuana emanating from the Escalade, and that alone gave them the necessary probable cause to conduct a search of the vehicle.") (*quoting Ramos*, 443 F.3d at 308).

Here, based upon the following evidence of record, the Court finds that the officers had probable cause to believe that contraband or evidence of illegal drug possession would be found in the Kia when they initially searched it.  First, Officer Joyce's investigative report, which explains that when Officer Joyce first approached the Kia and explained to Defendant the reasons why he had stopped the vehicle, both he and Officer Denis, who was standing at the passenger side window, could smell marijuana emanating from the vehicle, and thereafter, when Officer Tranter arrived on scene and approached the Kia, Officer Tranter also stated that he smelled marijuana emanating from the vehicle.  (Doc. 91-3).  Second, Officer Denis's investigative report, which explains that when Officer Denis approached the Kia at the beginning of the traffic stop, he smelled marijuana emanating from the vehicle.  (Doc. 91-4).  Third, Officer Joyce's body-worn camera video/audio recording, which corroborates the statements in the officers' investigative reports, in that it shows: (1) at the start of the traffic stop, when Officer Joyce first approached the Kia, the driver's window was down, such that the three officers would have been able to smell any marijuana emanating from the Kia as they each approached the vehicle; and (2) upon having Officer Tranter remove Defendant from the Kia, Officer Joyce explained to Defendant, from the rear of the Kia, that his issues of concern were not just with Defendant's license and outstanding warrant, but also "the smell of that" (Officer Joyce later described the smell to Ms. Kenney as a "small smell of marijuana coming from the car").  *See* (Doc. 91-1 at T01:24:40, T01:27:42, T01:36:47, Doc. 91-3 at 2,  Doc. 91-4 at 2).  Fourth, Officer

Joyce credibly testified that the type of marijuana out there, the strain, is very pungent, such that a strong smell can come from a very small amount of marijuana. (Tr. at 17).

Again, in so finding, the Court disagrees with Defendant's contention that the officers' statements about smelling marijuana when they first approached the Kia could not be credible because: (1) the police car's dash camera did not show either a joint being thrown out of the window of the Kia prior to it being stopped by the police in the dark or smoke emanating from the Kia as the officers approached the stopped car; (2) no marijuana cigarettes, burnt marijuana residue, or marijuana paraphernalia being found in the Kia once it was searched; and (3) the amount of marijuana found in the Kia was a small amount. The pungent odor of any smoked item can linger in a vehicle for quite some time, and Officer Joyce credibly testified that the type of marijuana out there, the strain, is very pungent, such that a strong smell can come from a very small amount of marijuana. (*Id.*).

As such, because there was probable cause for the officers to search the Kia for evidence of illegal possession of marijuana, the initial warrantless search of the Kia was lawful under the automobile exception to the Fourth Amendment's warrant requirement, and did not violate Defendant's Fourth Amendment right not to be subject to an unreasonable search.

> **4. *Defendant's Fourth Amendment right not to be subject to an unreasonable search was not violated when the officers searched the Kia after Defendant fled from the traffic stop and was apprehended because they had probable cause to believe that the Kia contained contraband or evidence of Defendant's illegal drug possession such that the search fell within the automobile exception to the Fourth Amendment's warrant requirement***

The subsequent search of the Kia, once Defendant fled from the traffic stop and was apprehended, also did not violate Defendant's Fourth Amendment right against unreasonable searches because said warrantless search of the Kia was lawful under the automobile exception to the Fourth Amendment's warrant requirement. *See Byrd*, *supra.* Specifically, based upon:

(1) Defendant fleeing from the traffic stop once the officers started searching the Kia; (2) the drugs and large amount of United States currency found on Defendant when he was apprehended less than 60 seconds after he fled from the traffic stop and the Kia; and (3) Defendant's spontaneous utterance, "It's mine, whatever you all find," the Court finds that there was probable cause for the officers to believe that contraband and evidence of Defendant's illegal drug possession would be found in the Kia, and thus, said search of the Kia without a search warrant did not violate Defendant's Fourth Amendment right not to be subject to an unreasonable search.

### IV.    CONCLUSION

For all of the foregoing reasons, Defendant's Fourth Amendment rights not to be unreasonably seized or searched were not violated by law enforcement on April 30, 2020, and Defendant's Motion to Suppress Evidence  (Doc. 85 at Crim. No. 21-73, Doc. 77 at Crim. No. 21-133) is DENIED.

SO ORDERED, this 17th day of June, 2023,

s/Arthur J. Schwab
Arthur J. Schwab
United States District Judge

cc:    All ECF Registered Counsel of Record